IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

FRUTH INC. and
FRUTH PHARMACY, INC.,

Plaintiffs,

v.                                                        CIVIL ACTION NO. 3:23-0801

CARDINAL HEALTH, INC.,
CARDINAL HEALTH 411, INC.,
CARDINAL HEALTH 110, LLC, and
CARDINAL HEALTH 112, LLC,

                            Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending is Defendants' Motion to Dismiss. ECF No. 14. For the reasons that follow, the

motion is **GRANTED in part and DENIED in part.**[1]

## I.  BACKGROUND

### A.  Section 340B of the Public Health Service Act

Before the Court delves into the factual allegations made by the Plaintiffs Fruth Inc. and

Fruth Pharmacy, Inc. (collectively, "Fruth"), it must first understand the "340B Drug Pricing

Program." The 340B Drug Pricing Program was authorized under Section 340B of the Public

---

[1] In making its decision, the Court considered the following memoranda: Memorandum of Law in Support of Defendants' Motion to Dismiss ("Defs.' Mem."), ECF No. 15; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pls.' Opp."), ECF No. 21; and Defendants' Reply Memorandum in Further Support of Their Motion to Dismiss Plaintiffs' Complaint, ECF No. 26 ("Defs.' Reply").

Health Service Act and created under Section 602 of the Veterans Health Care Act of 1992. *See* 42 U.S.C. § 256b. The program is administered by the Health Resources and Services Administration ("HRSA"), a unit within the United States Department of Health and Human Resources ("HHS"). *See Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 113 (2011). Section 340B "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities. Those facilities, here called '340B' or 'covered' entities, include public hospitals and community health centers, many of them providers of safety-net services to the poor." *Id.*; 42 U.S.C. § 256b(a)(1).

Fruth alleges the 340B Program operates as follows.[2] HHS enters into "purchase price agreements" ("PPAs") with drug manufacturers, who produce pharmaceuticals. Drug manufacturers then enter into separate, but related, agreements with drug wholesalers, like Defendants Cardinal Health, Inc., Cardinal 411, Inc.; Cardinal Health 110, LLC; and Cardinal Health 112, LLC (collectively "Cardinal"), who purchase and resell the drugs. Compl. ¶ 45. Under the 340B Program, "wholesalers are contractually required to sell a manufacturer's product at the price agreed to by the manufacturer in the PPA." *Id.* Thus, wholesalers are essentially "agents" of drug manufacturers. *Id.*

 "Under the terms of the PPAs, manufacturers (either directly or through their agents) agree to sell certain outpatient drugs to specified health care facilities (known as 'covered entities')[3] at or below a 'ceiling price,' which is calculated under a statutory formula." *Id.* at ¶ 46 (citing 42 U.S.C. § 256b(a)(l)). This ceiling price "is calculated based upon the difference

---

[2] This description does not appear to be challenged by Cardinal at this stage.
[3] "Covered entities" are statutorily defined to include 15 types of entities, including Federally Qualified Health Centers, critical access centers, and sole community hospitals. *See* 42 U.S.C. § 256(b)(4).

between the manufacturer's Average Manufacturer Price and the Medicaid unit rebate amount for a particular pharmaceutical drug." *Id.* at ¶ 49 (citing 42 U.S.C. § 256b(a)(1)-(2), (b)).

But it doesn't stop there. Additional players can be added into the mix. Covered entities "may elect to rely on a pharmacy (known as a 'contract pharmacy' under the 340B Program) to dispense pharmaceutical drugs to eligible patients under the 340B Program." *Id.* at ¶ 50.

As Fruth puts it, contract pharmacies "assume a significant risk by participating in the 340B Program[.]" *Id.* at ¶ 57. Instead of directly purchasing the drugs from the wholesaler at or below the ceiling price, they "often rely on drugs they already have in stock when they dispense drugs on behalf of a covered entity to eligible patients under the 340B Program." *Id.* at ¶ 54.[4] After dispensing the drug, the contract pharmacy is "made whole" by the manufacturer or wholesale "either by way of physical product replenishment or invoice credit for the cost of the drug." *Id.* at ¶ 56.

**B. Fruth's Factual Allegations**

Fruth alleges that at all relevant times, Cardinal served as the primary wholesaler for all of Fruth's retail pharmacy locations. *Id.* at ¶ 58. The parties entered a "Prime Vendor Agreement" on December 10, 2009, which "memorializ[ed] the terms of the parties' customer and supplier relationship" (the "2009 PVA"). *Id.* at ¶ 59 (citing 2009 PVA, ECF No. 1-1). The 2009 PVA was amended several times, including a November 8, 2014, amendment which reflected "Fruth's agreement to purchase 90% of all generic drug products through Cardinal's generic source program . . .." *Id.* at ¶ 61.

Fruth alleges that it "relied on drugs it purchased under the 2009 PVA in connection with its participation in the 340B Program" and that "[b]etween entering the 2009 PVA and

---

[4] These in stock drugs are presumably purchased at a rate higher than the 340B ceiling price.

continuing though in or about 2016, Fruth dispensed drugs under the 340B Program and then was made 'whole' by Cardinal when it received a physical shipment of replacement product." *Id.* at ¶¶ 62–63.

Beginning in early 2015, Cardinal's representatives began talking with Fruth representatives about a "new pilot invoicing credit program that it was offering to contract pharmacy participants of the 340B Program, including Fruth." *Id.* at ¶ 64–65. Fruth describes the pilot programs as follows:

> [I]f a contract pharmacy purchased a drug that was dispensed to an eligible patient under the 340B Program within the last 12 months, Cardinal would issue a credit to the contract pharmacy (rather than shipping physical replacement drugs to a contract pharmacy after it dispensed a drug to an eligible patient under the 340B Program). If the contract pharmacy did not purchase the drug that was dispensed to an eligible patient under the 340B Program within the last 12 months, Cardinal would then ship the product to the contract pharmacy, consistent with prior practice.

*Id.* at ¶ 65.

Fruth specifically alleges that Fruth and Cardinal representatives discussed how the new program would work and that Fruth's Chief Financial Officer even memorialized an April 13, 2015, conference between representatives noting, "Fruth will receive a credit and the credit will be via an [Manufacturer's Return Authorization] in the same manner as if [Fruth] received the product and returned it." *Id.* at ¶¶ 70–71 (alterations in Compl.). Despite an invitation to "supplement or correct" the CFO's memorialization, Cardinal's representatives did not correct that statement. *Id.* at ¶¶ 72–73. Consequently, Fruth's Complaint asserts that "[c]redit owed to Fruth under Cardinal's new 340B crediting program was to be handled consistent with returns for non-340B Program purchases, as memorialized in the applicable prime vendor agreement." *Id.* at ¶ 75. The applicable prime vendor agreement ("PVA") at the time Cardinal enrolled Fruth into the invoice program on March 14, 2016, was the "2009 PVA." *See id.* at ¶ 59.

On November 1, 2016, Fruth entered into the now operative "2016 PVA." *Id.* at ¶¶ 83–84. The 2016 PVA references neither the 340B Program generally nor Cardinal's invoicing credit program for 340B purchases. *See generally* 2016 PVA, ECF No. 1-2. Nevertheless, Fruth claims that the parties intended to include the invoice credit program in the contract, and that two sections of the agreement are relevant to the drugs dispensed to patients under the federal program, the Returned Goods Policy (attached to the PVA as Exhibit C) and Section 3, which "governs the purchase price of pharmaceutical drugs supplied by Cardinal." Compl. ¶¶ 90–91.

The Return Goods Policy provides, in relevant part, as follows:

> Products in "merchantable condition" (as defined below) and originally purchased from Cardinal Health may generally be returned to the customer's servicing Cardinal Health distribution center in accordance with, and subject to, the terms and conditions of this policy.

| Return Made Within: | Normal Credit Amount: |
|---|---|
| 1 – 365 Day from Invoice Date | 100% of original invoice amount paid by customer. This policy covers all order shortages, filling errors and damage if reported within two (2) business days and such products are returned within ten (10) business days to the date of the applicable invoice. |

> Returns made greater than 12 months from the invoice will not be accepted. No credit will be issued, and the product will be returned to customer.

PVA 29 (emphasis in original) (Exhibit C).

Section 3 of the 2016 PVA provides:

> *3.    Purchase Price*
>
> 3.1    <u>In General.</u> Except as otherwise set forth in this Agreement, Buyer will pay a purchase price for all Merchandise purchased under this Agreement in an amount equal to Cardinal Health's Cost for such Merchandise, plus the percentage specified in the pricing matrix attached hereto as **<u>Exhibit B</u>** (the "**Pricing Matrix**")**,** plus all applicable taxes or other assessments on such purchases. For purposes of this Agreement, (a) the term **"Cardinal Health's Cost"** will mean the manufacturer's published wholesale acquisition cost for the Merchandise at the time the Buyer's order is submitted to Cardinal Health; and (b) the term "**Net Purchases**" will mean all purchases made and paid for by Buyer and/or the Pharmacies under the terms of this Agreement, net of all returns,

credits, late charges, or other similar items, on an annual, quarterly, or monthly basis, as applicable. The purchase price of Merchandise that is subject to a Manufacturer Contract (as defined below) will equal Buyer's contract price of the applicable Merchandise as set forth in the Manufacturer Contract.

PVA § 3.1 (emphasis in original). The 2016 PVA provides limitations on this "Cost Plus Pricing" in the following subsection:

> 3.2 <u>Exceptions to Cost Plus Pricing.</u> Notwithstanding the foregoing, the purchase price for certain Merchandise (sometimes referred to herein as "**Specially Priced Merchandise**"), including, but not limited to, the following items, will not be based upon Cardinal Health's Cost-plus pricing described above:
> - multisource pharmaceuticals,
> - Cardinal Health Source Program ("**Source Program**") Merchandise,
> - private label products,
> - medical/surgical supplies,
> - home health care/durable medical equipment,
> - drop-shipped Merchandise,
> - Merchandise acquired from vendors not offering customary cash discount or other term, (on a quarterly basis, Cardinal Health will provide Buyer a report of any such Merchandise in such form as is mutually agreed upon by the parties), and
> - Non-pharmaceutical Merchandise.
>
> Except as otherwise set forth in this Agreement, Buyer may, but will have no obligation to, purchase any specified volume or percentage of its requirements to these items.

PVA § 3.2 (emphasis in original).

Fruth has participated in Cardinal's 340B Invoice Credit Program since March 2016. Compl. ¶ 95. Yet, since that time, it alleges "Cardinal [has] failed to provide Fruth with any report or documentation reflecting the credit owed and/or issued to Fruth, and through the parties' relationship, Cardinal refused to communicate with transparency regarding their crediting practices." *Id.* at ¶ 97. As a result, Fruth alleges that it "had no ability to determine whether it was receiving accurate invoice credits from Cardinal." *Id.* at ¶ 98.

In February 2020, Fruth representatives insisted that Cardinal provide documentation regarding its processing of 340B credits. *Id.* at ¶ 99. Cardinal provided a report the following month; however, "the report was vague and confusing and failed to include critical information, including, but not limited to, reference to the purchase invoice to which Cardinal was issuing a credit for drugs dispensed under the 340B Program." *Id.* at ¶ 100.

Following discussions with other chain drug stores regarding a new "Electronic Records Program" implemented by Cardinal, Fruth "discovered problems with credits issued to Fruth under Cardinal's 340B Invoice Credit Program." *Id.* at ¶¶ 104–05. Specifically, "on or about May 12, 2022, Fruth discovered that it was receiving less than what it was owed (by way of invoice credits) under Cardinal's 340B Invoice Credit Program because Cardinal was using historical and outdated invoices." *Id.* at ¶ 106.[5]

Fruth specifically avers that "between March 2016 through June 2022, Cardinal knowingly, intentionally, and fraudulently credited Fruth less than the amount Fruth was owed under Cardinal's 340B Invoice Credit Program," and that "[i]nstead of using the most recent cost of a pharmaceutical drug dispensed by Fruth under the 340B Program, Cardinal knowingly, intentionally, and fraudulently relied on historical invoices that reflect outdated drug costs when issuing a credit to Fruth." *Id.* at ¶¶ 116–17. In some instances, Cardinal relied on invoices that were more than a year old. *Id.* at ¶ 118. This practice "resulted in a financial windfall for the company while simultaneously causing substantial financial farm to Fruth and similarly situated

---

[5] This appears to be based in part on a conversation with "a senior executive of a regional retail pharmacy chain" who expressly "stated that Cardinal was knowingly and intentionally relying on outdated pricing when issuing credits to contract pharmacies." Compl. ¶ 108. That executive "believes that Cardinal was engaging in such conduct in an effort to have their contract pharmacy customers pay for the opioid lawsuits." *Id.*

pharmacies that were serving a critical role in the distribution chain under the 340B Program." *Id.* at ¶ 145.

Moreover, Fruth asserts that "[i]f Cardinal's representatives would have disclosed Cardinal's intention to rely on and use historical invoices reflecting outdated cost information when issuing credits under Cardinal's 340B Invoice Credit Program Fruth would not have agreed to participate in the program." *Id.* at ¶ 140.

After Fruth demanded change, Cardinal started to use recent invoices when crediting Fruth for 340B purchases. *Id.* at ¶¶ 148–150. And, "in an effort to facilitate a resolution between the parties with respect to the dispute over the 340B Program (and other issues), Cardinal and Fruth jointly engaged a forensic accounting firm." *Id.* at ¶ 154. Yet, six-months later, Cardinal "abruptly issued a Cease-and-Desist Notice to the forensic accounting firm intending to terminate their forensic work on the joint agreement." *Id.* at ¶¶ 155–56.

In addition to sales under the 340B Program, the 2016 PVA contains a "Primary Source Program Price Guarantee." *Id.* at ¶¶ 168–69. Fruth claims that this guarantee was made after "Fruth representatives communicated to Cardinal that generic drugs were available to purchase from other sources for costs substantially lower than what was being offered by Cardinal." *Id.* at ¶ 170.

The guarantee, as memorialized in Section 11.4 the 2016 PVA, provides:

11.4    <u>Primary Source Program Price Guarantee.</u>

11.4.1. <u>In General</u>. Cardinal Health guarantees that the invoice price paid by the Buyer on "Benchmark Source Program Purchases" (as defined below) shall not increase by more than one percent (1.00%) during a given Contract Year.

11.4.2. "Benchmark Source Program Purchases". As used in this Section, "Benchmark Source Program Purchases" for a given Contract Year shall mean the Buyer's aggregate unit Net Purchases through the primary Source Program portfolio (on an item by item basis), including, but not limited to, those generic Rx Products, purchased through the Generic Source Program, but excluding purchases through the back-up Source Program portfolio, under the Prime Vendor Agreement during the immediately preceding Contract Year. Contract Health will determine the baseline net price of the Benchmark Source Program Purchases for a given Contract Year by multiplying the Benchmark Source Program Purchases for the Contract Year by the invoice price for each applicable primary Source Program item on the last day of the immediately preceding Contract Year. For the sake of clarity, the parties hereby acknowledge and agree that the Buyer's "Benchmark Source Program Purchases" for the initial Contract Year shall equal the Buyer's aggregate purchases made and paid for by the Buyer and/or the Pharmacies through the primary Source Program portfolio, including, but not limited to, those generic Rx Produces purchased through the Generic Source Program, but excluding purchases through the back-up Source Program portfolio, under the terms of the prior Prime Vendor Agreement between the parties from November 1, 2015, through October 31, 2016, net of all returns, credits, late charges, or other similar items. The parties further acknowledge and agree that Cardinal Health will determine the baseline net prices of the Benchmark Source Program Purchases for the initial Contract Year by multiplying the Benchmark Source Program Purchases for the Contract Year the invoice price for each applicable primary Source Program item as of the Effective Date of this Agreement.

11.4.3. Primary Source Program Price Guarantee Rebate. At the end of each Contract Year, Cardinal Health will multiply the Benchmark Source Program Purchases for the Contract Year by the invoice price for each applicable primary Source Program item on the last day of the applicable Contract Year. If the net pricing of the Benchmark Source Program Purchases increased more than 1.00% over the baseline net price of the Benchmark Source Program Purchases during the Contract Year, Cardinal Health will pay the Buyer a rebate (the "**Primary Source Program Price Guarantee Rebate**") in an amount equal to the difference between the net invoice price paid and the allowable invoice price (i.e., 1.00% over the baseline net price of the Benchmark Source Program Purchases for the Contract Year), less the value of the rebates paid to the Buyer on the Benchmark Source Program Purchases during the Contract Year. For example:

| Benchmark Source Program Purchases at Day 1 Economics | |
|---|---|
| Benchmark Source Program Purchases at invoice | $1,000,000 |
| Maximum Allowable Price for purchase at invoice (1.00%) | $1,010,000 |

| Benchmark Source Program Purchases at Day 365 Economics | |
|---|---|
| Benchmark Source Program Purchases at invoice | $1,050,000 |
| Difference between Day 365 and Day 1 Benchmark Source Program Purchases at invoice | $50,000 |
| Allowable increase | $10,000 |
| Actual Benchmark Invoice Increase | $40,000 |
| Generic Rebate Paid During Contract Year | 40.00% |
| Rebate on difference already paid ($40k *40%) | $16,000 |
| **Primary Source Program Price Guarantee Rebate ($40,000 - $16,000)** | **$24,000** |

> The Primary Source Program Price Guarantee Rebate shall be calculated by Cardinal Health for each full Contract Year this Agreement is in effect and shall be provided by Cardinal Health to the Buyer, if applicable, within thirty (30) days after the end of the applicable Contract Year via check, EFT, or in the form of a credit memorandum to be used by the Buyer toward future purchases of Merchandise under this Agreement as mutually agreed upon by the parties.

PVA § 11.4 (emphasis in original).

Fruth contends that "Cardinal failed to comply with Section 11.4.1 of the 2016 PVA because it increased its prices for generic drugs in amounts greater than one percent (1.00%) of the manufacturer prices during contract year." Compl. ¶ 175. This breach became evident to Fruth after Cardinal implemented its new Electronic Records Program (also referred to as "SAP") in November of 2021, because the new invoices "reflect[ed] an obvious and substantial increase in generic drug costs as compared to manufacturer pricing and data reported by the National Average Drug Acquisition Cost ('NADAC')." *Id.* at ¶¶ 176–77.

"Fruth analyzed Cardinal's increased generic drug costs as compared to the volume of drugs Fruth was dispensing and its inventory during the relevant time period" and "determined that it was dispensing less drugs and the volume of its inventory was declining, while the amounts reflected as due on Cardinal's invoices were increasing." *Id.* at ¶ 179. Fruth notes that this "was particularly troubling" "because generic drug costs industry-wide were decreasing and Cardinal's pricing was drastically higher than data reported by NADAC." *Id.*

When Fruth complained to Cardinal about being charged "higher prices for generic drugs in a deflationary market" and expressed concern that Cardinal was not complying with the price guarantee in the 2016 PVA, it was "advised that Cardinal was working to address various issues related to the implementation of the SAP, including an explanation for the increase in generic drug costs." *Id.* at ¶¶ 182–84. Nevertheless, despite congoing conversations, "Cardinal never had any definitive answers." *Id.* at ¶ 185.

In response, Fruth sought to have the issue reviewed by a forensic accounting firm, but "Cardinal refused to provide the accounting firm with documentation of manufacturer pricing" and has since "continue[d] to refuse to provide manufacturer pricing to Fruth." *Id.* at ¶¶ 186–87.

Cardinal representatives have since explained that Cardinal has calculated the one percent price guarantee in a manner it believes is consistent with the text of Section 11.4.2 of the 2016 PVA. *Id.* at 189–91. This calculation essentially only analyzes drug costs on two dates—the first day of the present contract year (November 1) and the last day of the preceding contract year (October 31). *Id.* at ¶¶ 191–93. Fruth asserts that this methodology "is inconsistent with the parties' intent and the express terms of the 2016 PVA." *Id.* at ¶ 195. It also alleges that "i[f] Cardinal had disclosed its intention to disregard all of the actual cost of drugs purchased by Fruth throughout a given year when calculating its 'price increases' under Section 11.4, Fruth never would have entered into the PVA." *Id.* at ¶ 196. Finally, Fruth alleges "upon information and belief," that "Cardinal also manipulates the drug prices on November 1 and October 31 in an effort to conceal its improper pricing tactics." *Id.* at ¶¶ 199–200.

On December 19, 2023, Fruth filed suit in this Court asserting six causes of action: (I) fraud in the inducement, (II) breach of contract, (III) unjust enrichment, (IV) conversion, (V)

fraudulent concealment, and (VI) "for an accounting."[6] Cardinal has moved to dismiss the case in its entirety.

## II.  LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain "a short and plain statement of the claim showing [the plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). While the facts alleged in the complaint need not be probable, the statement must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In considering the plausibility of a plaintiff's claim, the Court accepts all factual allegations in the complaint as true. *Id.* Still, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. If a court finds from its analysis that "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Id.* (quoting, in part, Fed. R. Civ. P. 8(a)(2)). Nonetheless, a plaintiff need not show that success is probable to withstand a motion to dismiss. *Twombly*, 550

---

[6] Fruth alleges that this Court has subject matter jurisdiction because there is complete diversity of citizenship and the amount in controversy exceeds the sum of $75,000.00. *See* Compl. ¶¶ 24–25, 27–29, 32–37, 226, 251, 257, 268, 285.

U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.").

### III. ANALYSIS

#### A.    Breach of Contract

To state a valid claim for breach of contract under West Virginia Law, a plaintiff must plead the following: "[1] the existence of a valid, enforceable contract; [2] that the plaintiff has performed under the contract; [3] that the defendant has breached or violated its duties or obligations under the contract; [4] and that the plaintiff has been injured as a result." *Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*, 681 F. Supp. 2d 694, 714 (S.D.W. Va. 2009).

Additionally, West Virginia law implies a covenant of good faith and fair dealing in every contract "for purposes of evaluating a party's performance of that contract." *Evans v. United Bank, Inc.*, 775 S.E.2d 500, 509 (W. Va. 2015) (quoting *Stand Energy Corp. v. Columbia Gas Trans.*, 373 F. Supp. 2d 631 (S.D.W. Va. 2005)). But that implied covenant can neither "give contracting parties rights which are inconsistent with those set out in the contract," *Barn-Chestnut, Inc. v. CFM Dev. Corp.*, 457 S.E.2d 502, 509 (W. Va. 1995)), nor "provide a cause of action apart from a breach of contract claim," *Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 579 (W. Va. 2013). "Nevertheless, when a breach of contract claim is adequately pled, a separate claim alleging a breach of the common law duty of good faith and fair dealing with respect to the purported contract may stand." *Cunningham Energy, LLC v. Vesta O&G Holdings, LLC*, 578 F. Supp. 3d 798, 812 (S.D.W. Va. 2022).

With these basic tenets in mind, the Court turns to the breaches alleged by Fruth.

-13-

1. <u>340B Program Credits</u>

Regarding 340B Program Credits, Fruth alleges that Cardinal breached the 2016 PVA by not charging Fruth "Cardinal's Cost of the Merchandise" at the time 340B orders were submitted to Cardinal, Compl. ¶¶ 230–238, or, alternatively, by failing to comply with the "Returned Goods Policy" and using outdated invoices, *id.* at ¶ 238. Additionally, Fruth alleges that Cardinal failed to act in good faith with respect to these credits, in breach of the covenant of good faith and fair dealing. *Id.* at ¶¶ 246–47.

In its motion and supporting memoranda, Cardinal alleges that dismissal of Fruth's claims relating to the 340B Program is appropriate because "nothing in the PVA required Cardinal Health to credit the most recent invoices." Defs.' Mem. at 12. This argument misses the mark. Even though "340B" is not explicitly mentioned in the 2016 PVA, Fruth has sufficiently alleged that 340B Program sales were handled under the contract. Moreover, even if Cardinal is not required to use the most recent invoices, it may still be a breach of contract for Cardinal to use extremely dated invoices.[7]

Here, the Court finds that Fruth has successfully alleged that Cardinal breached its contract with Fruth by relying on historical invoices to compensate Fruth for drug sales under the 340B Program for a number of reasons:

*First*, although Section 3.1 2016 PVA provides that Fruth will generally pay "Cardinal Health's Cost," for all Merchandise purchased under the Agreement, Section 3.2 plainly states that Section 3.1 may not apply to many types of Merchandise. *See* 2016 PVA § 3.2

---

[7] Indeed, to accept Cardinal's argument would require the Court to believe that the 2016 PVA somehow allows Cardinal to provide "reimbursements" for drug sales under a federal program which is "aimed at aiding community delivery of drugs to underserved populations" that do not actually cover the cost of the drugs dispersed. Pls.' Resp. at 14. The Court declines to adopt that construction of the 2016 PVA at this stage without textual evidence to support it.

-14-

("Notwithstanding the foregoing, the purchase price for certain Merchandise . . ., including *but not limited to*, the following items, will not be based upon Cardinal Health's Cost-plus pricing described above[.]") (emphasis added). For this reason alone, there is some ambiguity as to whether Section 3.1 applies to the 340B sales.

*Second*, because it is not clear that Section 3.1 applies to 340B sales, the Court finds that Fruth is entitled to use extrinsic evidence to establish the parties' intent. *See* Syl. Pt. 2, *Berkeley Cnty. Pub. Serv. Dist. v. Vitro Corp. of Am.*, 162 S.E.2d 189, 191 (W. Va. 1968) ("Extrinsic evidence may be used to aid in the construction of a contract if the matter in controversy is not clearly expressed in the contract, and in such case the intention of the parties is always important and the court may consider parol evidence in connection therewith with regard to conditions and objections relative to the matters involved."). Here, Fruth has adequately alleged that the parties intended to process 340B credits "in the same manner in which credits for returns are handled under the applicable prime vendor agreement." Compl. ¶ 72; *see id.* at ¶¶ 71–75, 129–33. If Fruth is able to prove through extrinsic evidence that this was the intent of the parties, then the usage of historical invoices would certainly be a breach of the agreement. *See* PVA Ex. C (providing that credits will be "100% of original invoice amount paid by customer").

*Third*, if Section 3.1 does apply, Fruth adequately alleges that Cardinal breached that section by relying on historical invoices, rather than "the manufacturer's published wholesale acquisition cost for the Merchandise *at the time the Buyer's order is submitted*." 2016 PVA § 3.1 (emphasis added); *see* Compl. ¶¶ 122–26; 230–37.

*Fourth*, inasmuch as Fruth has stated a viable express breach of contract claim, the Court finds that the covenant of good faith and fair dealing is relevant to "evaluating [Cardinal's] performance of the contract." *Stand Energy Corp.*, 373 F. Supp. 2d at 644. Here, Fruth alleges

that Cardinal acted in bad faith by taking "opportunistic advantage of Fruth [with] respect to the 2016 PVA and Cardinal's 340B Invoice Credit Program" by, *inter alia*, "intentionally relying on outdating pricing," providing "vague and confusing" reporting regarding how the claims are processed, and refusing to provide documentation so that Fruth can assess how the 340B reimbursements were processed. Compl. ¶¶ 100, 101, 103, 108, 114–120, 154–59; 289–290. Those allegations are enough to support an additional claim for breach of the covenant of good faith and fair dealing. *See Cunningham Energy, LLC*, 578 F. Supp. 3d at 812; *Hanshaw v. Wells Fargo Bank, N.A.*, No. 2:14-CV-28042, 2015 WL 5345439 (S.D.W. Va. Sept. 11, 2015).

    2.  <u>11.4 Price Guarantee</u>

    As it pertains to the price guarantee in Section 11.4 of the 2016 PVA, Fruth alleges that Cardinal committed the following breaches: (1) Cardinal "knowingly and intentionally increase[ed] Fruth's costs for certain drugs more than one percent (1.00%) of the manufacturer's pricing during a given year;" (2) Cardinal "manipulat[ed] pricing for generic drugs on specific dates in an effort to justify improper price increases;" and (3) Cardinal failed to act in good faith with respect to its performance under the 2016 PVA, thereby breaching the covenant of good faith and fair dealing. Compl. ¶¶ 246–47.

    Cardinal argues Fruth's breach of contract claims related to Section 11.4 must be dismissed because it complied with the calculation methodology set forth in the in Section 11.4.3. Defs.' Mem. at 14. Accordingly, Cardinal argues, even accepting Fruth's allegations as true, the 2016 PVA would not prevent it from "manipulat[ing] drug prices on November 1 and October 31 in an effort to conceal its improper pricing tactics." *Id.* at 15.

    While the Court agrees with Cardinal that the text of Section 11.4.3 dictates its compliance with the 1.00% price increase guarantee is calculated by comparing the invoice price

for each applicable primary Source Program item on the first day of the applicable contract year with the invoice price for the item on the last day of the immediately preceding Contract Year, *see* PVA § 11.4.3, it is clear from Section 11.4.1, that the purpose of the guarantee is to limit the amount that Cardinal increases drug prices during a given year. In the absence of manipulation or malfeasance, this metric is a simple way to determine whether Cardinal's prices have increased more than the allotted 1.00% cover the calendar year. Yet, Fruth alleges that Cardinal is applying the formula in a grossly unfair way. Compl. ¶¶ 180–81, 199–200, 234, 240. The Court finds Fruth's allegations that Cardinal purposefully manipulated drug costs on certain days, so as to circumvent its responsibilities and render the Benchmark Source Program Price Guarantee illusory, are sufficient to state a breach of Section 11.4 and the implied covenant of good faith and fair dealing. *See id.* at ¶¶ 199–200. Indeed, the Court is unable to find based on the text of the 2016 PVA, that the parties intended to allow for such price manipulation. Surely no buyer would have accepted the terms if that was the intended effect. *See CONSOL Energy, Inc. v. Hummel*, 792 S.E.2d 613, 620 (W. Va. 2016) (quoting *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) for the propositions that "[a]n unreasonable interpretation produces a result that 'no reasonable person would have accepted when entering the contract'").

In sum, the Court finds that Fruth has plausibly alleged Cardinal committed multiple breaches of contract and denies Cardinal's motion to dismiss Count II of the Complaint.

## B. Quasi Contractual Claims

West Virginia law provides that "if benefits have been received and retained under such circumstances that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefore, the law requires the party receiving the benefits to pay their reasonable value." *Copley v. Mingo Cnty. Bd. of Educ.*, 466 S.E.2d 139, 145 n.17 (W. Va. 1995).

These claims for unjust enrichment, however, are "quasicontractual" and "may not be brought in the face of an express contract." *Heater v. General Motors, LLC*, 568 F. Supp. 3d 626, 642 (N.D.W. Va. 2021) (quoting *Bright v. QSP, Inc.*, 20 F.3d 1300, 1306 (4th Cir. 1994)); Syl. Pt. 3, *Gulfport Energy Corp. v. Harbert Priv. Equity Partners, LP*, 851 S.E.2d 817 (W. Va. 2020) ("As a species of quasi contract relief, unjust enrichment does not exist to provide an alternative means of recovery for breach of contract, nor does it exist to reduce contract disputes to a question of whether one party benefitted from the other party's performance.").

In this case, Fruth argues that dismissal of its unjust enrichment claims is not warranted because the Federal Rules of Civil Procedure permit plaintiffs to plead alternative claims. Pls.' Resp. at 16–18.

While the Court agrees that "it is unnecessary for a plaintiff to elect and plead a single theory of recovery," *Randolph v. Columbia Gas Transmission, LLC,* No. CV 3:23-00006, 2023 WL 5602316 (S.D.W. Va. Aug. 29, 2023), it finds that West Virginia case law prohibits Fruth from proceeding on both breach of contract and unjust enrichment claims in this case. Unlike cases where some question regarding the applicability of a contract remains, *see, e.g.*, *Heater*, 568 F. Supp. 3d at 642, it is apparent that both 340B sales and the sales of generic drugs were governed by, and handled under, the 2016 PVA. Accordingly, the unjust enrichment claims in Count III are eclipsed by the breach of contract claims in Count II, and Count III must be dismissed. *See N. Ave. Cap., LLC v. Ranger Sci. LLC*, No. 2:23-CV-00015, 2024 WL 2097596, at *5 (S.D.W. Va. May 9, 2024).

## C. Tort Claims

Cardinal also argues that Fruth's tort claims must be dismissed pursuant to the "gist of the action doctrine." Under West Virginia's gist of the action doctrine, "[a]n action in tort will

not arise for breach of contract unless the action in tort would arise independent of the existence of the contract." *Soyoola v. Oceanus Ins. Co.*, 986 F. Supp. 2d 695, 707 (S.D.W. Va. 2013) (quoting *Lockhart v. Airco Heating & Cooling, Inc.*, 567 S.E.2d 619 (W. Va.2002)). "Whether a tort claim can coexist with a contract claim is determined by examining whether the parties' obligations are defined by the terms of the contract." *Gaddy Eng'g Co.*, 746 S.E.2d at 577 (citing *Goldstein v. Elk Lighting, Inc.*, No. 3:12-CV-168, 2013 WL 790765, at *3 (M.D. Pa. Mar. 4, 2013)). The gist of the action doctrine is intended to prevent the recasting of contract claims as tort claims. *Id.*; *Covol Fuels No. 4, LLC v. Pinnacle Mining Co.*, 785 F.3d 104, 115–16 (4th Cir. 2015) (holding the gist of the action doctrine bars "a breach of contract claim masquerading as a tort"). Therefore, actions based in tort are barred in the following situations:

> (1) where liability arises solely from the contractual relationship between the parties;
> (2) when the alleged duties breached were grounded in the contract itself;
> (3) where any liability stems from the contract; [and/or]
> (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

*Gaddy Eng'g Co.*, 746 S.E.2d at 577 (citing *Star v. Rosenthal*, 884 F. Supp. 2d 319, 328–29 (E.D. Pa. 2012)). Thus, the doctrine "requires plaintiffs seeking relief in tort to identify a non-contractual duty breached by the alleged tortfeasor." *Dan Ryan Builders, Inc. v. Crystal Ridge Dev., Inc.*, 783 F.3d 976, 980 (4th Cir. 2015).

As a threshold matter, Fruth argues that a motion to dismiss is not the proper time to decide whether a cause of action is barred by the gist of the action doctrine. Pls.' Mem. 19, 21–22 (citing *Brooke Cnty. Parks & Rec. Comm'n v. R&R Pools & Constr., Inc.*, No. 5:23-CV-127, 2024 WL 990064 (N.D.W. Va. Feb. 26, 2024); *Princeton Cmty. Hosp. Ass'n, Inc. v. Nuance Commc'ns, Inc.*, No. CV 1:19-00265, 2020 WL 1698363 (S.D.W. Va. Apr. 7, 2020); *Baker v.*

*Fam. Credit Counseling Corp.*, 440 F. Supp. 2d 392, 418 (E.D. Pa. 2006)). The Court finds that Fruth reads these cases too broadly, and that the question of whether a tort claim is barred by the gist of the action doctrine may be answered at the motion to dismiss stage if the plaintiff has not plausibly alleged a claim that could succeed independent of the plaintiff's success on the breach of contract claim. As such, the Court must assess the gist of the action doctrine in as it applies to each alleged tort.

        1.   <u>Fraud in the Inducement</u>

The gist of the action doctrine is inapplicable for fraud based on "expression[s] of intention" made at the time a promise was made, where the promising party lacked the intent to fulfil its promises. *Soyoola*, 986 F. Supp. 2d at 707–08 (quoting *Croston v. Emax Oil Co.*, 464 S.E.2d 728, 732 (W. Va. 1995)); *see Indus. Maint. Sols., LLC v. BGSE Grp., LLC*, No. 1:22-CV-12, 2022 WL 4239347, at *4 (N.D.W. Va. Sept. 14, 2022) (finding fraud sufficiently pled as separate from contract breach where defendant allegedly made fraudulent inducements during contract negotiations). Thus, where "success of the fraud claim may not depend upon proving that [defendant] breached its obligations under the contract" the gist of the action doctrine will not bar a claim. *Perrine v. Branch Banking & Tr. Co.*, No. 2:17-CV-70, 2018 WL 11372226, at *4 (N.D.W. Va. Sept. 25, 2018).

West Virginia law provides the following elements for a fraud claim: "(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; (3) that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (4) that he was damaged because he relied upon it." *Bowens v. Allied Warehousing Servs., Inc.*, 729 S.E.2d 845, 852 (W. Va. 2012).

Regarding the 340B Program, Fruth alleges that "Cardinal intentionally misrepresented to Fruth that it would rely on and use the most recent invoice when issuing credits to Fruth for drugs dispensed to eligible patients under the 340B Program." Compl. ¶¶ 71, 72, 128, 133, 213. Fruth further alleges that these misrepresentations were "material to the parties' contractual relationship and Fruth's willingness to participate in Cardinal's 340B Invoice Credit Program," *id.* at ¶ 216, and that "[i]f Cardinal's representatives would have disclosed Cardinal's intention to rely on and use historical invoices reflecting outdated cost information when issuing credits under Cardinal's 340B Invoice Credit Program[,] Fruth would not have agreed to participate in the program," *id.* at ¶ 140. Finally, Fruth alleges that its reliance was justifiable and that as a result of its reliance it has been substantially harmed. *Id.* ¶¶ 217, 220.

The Court finds that these allegations plausibly plead that Fruth was fraudulently induced into joining Cardinal's 340B Invoice Credit Program. Despite Cardinal's suggestions to the contrary, *see* Defs.' Reply at 14, if Fruth proves its allegations at trial concerning Cardinal's misrepresentations during the contract proposal process, Fruth could prevail on a fraudulent inducement claim without having to prove that Cardinal breached its obligations under the contract. *See Soyoola*, 986 F. Supp. 2d at 707-08; *Indus. Maint. Sols.*, 2022 WL 4239347, at *4. Consequently, the gist of the action doctrine is inapplicable to Fruth's claim for fraudulent inducement as it relates to the 340B Invoice Credit Program.

The Court cannot make the same conclusion as Fruth's claims for fraudulent inducment relating to the price guarantee in Section 11.4. Fruth makes only vague allegations regarding Cardinal's pre-contract representations regarding the 1.00% price guarantee. *See* Compl. ¶¶ 170–71. Additionally, unlike the 2016 PVA's failure to even mention 340B sales, the contract explicitly outlines the price guarantee. As such, Cardinal's "alleged inducing promises" are part

of the written contract and cannot stand independent of Fruth's claims for breach of contract. *See* Defs.' Reply at 15. Accordingly, Fruth has failed "to identify a non-contractual duty breached by the alleged tortfeasor," *Dan Ryan Builders, Inc.*, 783 F.3d at 980, and the fraud in the inducement claim pertaining to the 1.00% price guarantee in Section 11.4 is dismissed.

    2.  <u>Conversion</u>

West Virginia has long been defined conversion as "[a]ny distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith." Syl., *Pine & Cypress Mfg. Co. v. Am. Eng'g & Constr. Co.*, 125 S.E. 375 (W. Va. 1924); *Rodgers v. Rodgers*, 399 S.E.2d 664, 667 (W. Va. 1990). The act of conversion can be proven in one of three ways: "(1) by tortious taking, (2) by any use or appropriation to the use of the defendant indicating a claim of right in opposition to the rights of the owner, or (3) by a refusal to give up the passion to the owner on demand." *Shamblin's Ready Mix, Inc. v. Eaton Corp.*, 819 F.2d 1139 (4th Cir. 1987) (unpublished) (citing *Haines v. Cochran Bros.*, 26 W. Va. 719 (1885)).

With respect to 340B Program Credits, Fruth alleges it "was entitled to receive an invoice credit in an amount greater than the amount of credit provided by Cardinal for drugs Fruth dispensed to eligible patients under the 340B Program," and therefore that Cardinal "unlawfully and tortiously took money belonging to Fruth by way of crediting Fruth less than the amount Fruth was owed under Cardinal's 340B Invoice Credit Program." Compl. ¶¶ 260–61.

As to Section 11.4 of the 2016 PVA, Fruth alleges Cardinal is liable for conversion because "Cardinal unlawfully and tortiously took money belonging to Fruth by knowingly and intentionally increasing Fruth's costs for certain drugs more than one percent (1.00%) of the manufacturer's pricing during a given year, in violation of its contractual rights, including, but

not limited to, Section 11.4 of the 2016 PVA, and the covenant of good faith and fair dealing." *Id.* at ¶ 264.

In sum, Fruth alleges that, as a result of Cardinals breaches of the 2016 PVA, Cardinal tortiously took and withheld money from Fruth. Such allegations "essentially duplicate[]" Fruth's breach of contract claims. *See Gaddy Eng'g Co.*, 746 S.E.2d at 577.

Since Fruth's conversion claim could not arise "independent of the existence of the contract," the Court finds that it is barred by the gist of the action doctrine. *Conner v. Associated Radiologists, Inc.*, No. 2:19-CV-00329, 2020 WL 762858, at *12 (S.D.W. Va. Feb. 14, 2020) (noting a conversion claim that "simply recasts Plaintiff's claim for breach of contract" is barred by the gist of the action doctrine); *S. County Farms, Inc. v. Th Expl., LLC*, No. 5:21-CV-84, 2021 WL 5147989, at *3 (N.D.W. Va. Nov. 4, 2021) (finding gist of the action doctrine bars a claim for conversion when the "claim is entirely dependent on the success of the breach of contract claim"). Accordingly, Count IV of Fruth's Complaint is dismissed.

### 3. Fraudulent Concealment

"Fraudulent concealment involves the concealment of facts by one with knowledge or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud." *Trafalgar House Const., Inc. v. ZMM, Inc.*, 567 S.E.2d 294, 300 (2002). The tort of fraudulent concealment is most often seen in two situations: (1) "when the defendant actively conceals a defect or other disadvantage in something that he is offering for sale to another" (i.e., a defect in the product or property being sold), or (2) "when the defendant successfully prevents the plaintiff from making an investigation that he would otherwise have made, and which, if made, would have disclosed the facts[.]" Restatement (Second) of Torts § 550 (1977).

In its Complaint, Fruth alleges "Cardinal intentionally and knowingly concealed the fact that it would not use the most recent invoice when issuing credits to Fruth for drugs dispensed to eligible patients under the 340B Program," and, with respect to the Price Guarantee in Section 11.4, Fruth alleges Cardinal "intentionally and knowingly concealed the fact that it would manipulate its prices throughout the year for its own financial gain and benefit." Compl. ¶¶ 270, 276. Fruth alleges that these concealments were intended to mislead Fruth and "caused Fruth, as the relying party, to suffer significant damages." *Id.* at ¶ 284.

Fruth does not allege that Cardinal concealed a defect or disadvantage in Cardinals' products. Nor does it allege that Fruth prevented plaintiff from undertaking an investigation that would have disclosed these facts. Instead, Fruth's fraudulent concealment claim essentially repackages its claim for fraudulent inducement. *See id.* at ¶ 275 ("Cardinal concealed such facts with the intent to mislead Fruth and convince Fruth to participate in its 340B Invoice Credit Program."); *id.* at ¶ 282 ("Cardinal concealed such facts with the intent to mislead Fruth and convince Fruth to purchase pharmaceutical drugs from Cardinal and enter into the 2016 PVA."). Such duplicative claims cannot independently stand. Count V of Fruth's Complaint is therefore dismissed.

## D. Accounting

Finally, as its sixth cause of action, Fruth seeks an "accounting" from Cardinal. Cardinal argues that "West Virginia allows claims for accounting only in narrow circumstances," including when authorized by W. Va. Code § 55-8-13 or where the parties have a fiduciary relationship. *See* Defs.' Mem. at 20.

West Virginia Code § 55-8-13 provides that "[a]n action of account may be maintained against the personal representative of any guardian or receiver; and also by one joint tenant,

tenant in common, or coparcener or his personal representative against the other, or against the personal representative of the other, for receiving more than his just share or proportion." Yet, "[n]othing in the provision indicates that the relationships cited therein are the only relationships in which a party may be entitled to an accounting." *In re Tara Retail Grp., LLC*, No. 17-BK-57, 2019 WL 4384097, at *7 (Bankr. N.D.W. Va. Sept. 12, 2019).

The Court is not convinced that dismissal of Fruth's accounting claim is appropriate at this stage of the proceedings. Fruth has plausibly alleged that Fruth and Cardinal have a "special relationship" that permits Fruth to assert an accounting claim. *See* Pls.' Resp. at 25. Section 28 of the 2016 PVA specifically provides for two types of buyer audits: (1) Fruth has the right to a once year audit of Cardinal Health records to "verify[] compliance with the pricing terms of this Agreement", and (2) Fruth has the right to "retain a mutually agreed upon third party auditor to review relevant records for the sole purpose of verifying Cardinal Health's compliance with the provisions of the Primary Source Program Price Guarantee." 2016 PVA § 28.1.[8] These contractual provisions in the 2016 PVA alone are enough for Fruth's accounting claim to survive a motion to dismiss.

---

[8] Although both of these auditing rights are limited to 12 months of historical information, the Complaint alleges that Fruth has been unsuccessfully seeking records relating to the 340B since March 2016 and records related to the Primary Source Program Price Guarantee since at least June 30, 2022. Compl. ¶¶ 97–101, 155–56, 186–87, 290–91.

## IV. CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss, ECF No. 14, is **GRANTED in part and DENIED in part.** The Court **ORDERS** following claims are **DISMISSED** from Fruth's Complaint:

> (1) Fruth's fraud in the inducement claim in Count I, only as it relates to the Primary Source Program Price Guarantee in Section 11.4;
>
> (2) Fruth's claims for unjust enrichment in Count III;
>
> (3) Fruth's claims for conversion in Count IV; and
>
> (4) Fruth's claims for fraudulent concealment in Count V.

The motion is otherwise **DENIED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:    June 28, 2024

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE